**IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF VIRGINIA
Newport News Division**

**UNITED STATES OF AMERICA**

**v.**                                                                                    **Criminal No.: 4:05cr58**

**HAROLD KNOX,**

                                   **Defendant.**


## ORDER AND OPINION

This matter comes before the Court on Defendant's Motions to Dismiss the Indictment on the following three grounds: 1) Vindictive Prosecution; 2) Violation of the Right to a Speedy Trial; and 3) Renewed Motion to Dismiss for Discovery Failures, filed on January 26, 2006. (Docs. 28-30.)  In the alternative, Defendant moves the Court to continue the trial date, scheduled for February 21, 2006, and to compel the Government to produce specific documents and materials listed in the Defendant's discovery Motion.  On January 31, 2006, the Government filed its responses.  (Docs. 31-33.)

The Court conducted a hearing on these matters commencing on February 8, 2006, and continuing on February 9, 2006.  The Court **DENIED** Defendant's Motion to Dismiss for Vindictive Prosecution from the bench because the Defendant failed to allege facts amounting to a prima facie violation.  Due to the complexity of the case and the volume of evidence involved, the Court took Defendant's remaining Motions to Dismiss under advisement and **GRANTED** Defendant's Motion to continue the trial date from the bench.  For the reasons set forth herein, the Court **GRANTS** Defendant's Motion to Dismiss for a Violation of the Right to a Speedy Trial.

Defendant's Renewed Motion to Dismiss for Discovery Failures is subsumed in the speedy trial violation. This Order and Opinion further explains the Court's ruling.

## I. FACTUAL BACKGROUND AND PROCEDURAL HISTORY

Defendant has been continuously held in either federal or state custody since March 2001 without the benefit of trial. On March 21, 2001, the Defendant was arrested by the Government[1] and taken into federal custody for offenses relating to a string of bank robberies and related firearms offenses that took place between 1983 and 2000 in Virginia and North Carolina and spanned at least thirteen (13) separate jurisdictions.[2] On April 5, 2001, Defendant, along with several co-defendants, were indicted in the Richmond Division of the Eastern District of Virginia for various bank robberies and related firearms offenses [hereinafter "Richmond prosecution"].[3] On June 5, 2001, a superceding indictment was returned, adding additional offenses[4] and two co-defendants.[5] Defendant was scheduled to stand trial on September 10, 2001. On April 18, 2001,

---

[1]The use of the term "Government" refers to the federal United States Government and pertains to all federal actions that took place in the overall investigation and prosecution of this case.

[2]The Court has counted the number of separate jurisdictions cited in the instant Indictment. However, the Government's overall investigation took on a broader number of jurisdictions.

[3]Co-defendants named in the indictment were Roger Lee Harrell, Robert Calvin Boone, and Gwen Hardison. See Indictment in Richmond prosecution, dated April 5, 2001, docket no. 3:01cr112. Robert Boone pled guilty before Judge Payne on May 9, 2001, Gwen Hardison pled guilty before Judge Payne on June 18, 2001, and Roger Harrell pled guilty in Virginia Beach state court in October 2002.

[4]The charged offenses contained in the superceding indictment in the Richmond prosecution were: 1) Count One – Bank Robbery Conspiracy, in violation of 18 U.S.C. § 371; 2) Count Two – Conspiracy to Use Firearms, in violation of 18 U.S.C. § 924(c); 3) Counts Three through Twenty-Three – Armed Bank Robbery, in violation of 18 U.S.C. §§ 2113(a) and (d); 4) Counts Twenty-Four through Forty-Four – Using a Weapon in Relation to a Crime of Violence, in violation of 18 U.S.C. § 924(c)(1)(A)(ii); and 5) Counts Forty-Five through Sixty-Five – Use of a Firearm by a Convicted Felon, in violation of 18 U.S.C. § 922(g)(1). See Superceding Indictment in the Richmond Prosecution, dated June 5, 2001. The robberies listed in the superceding indictment were the same as those listed as robberies or overt acts in the instant Indictment.

[5]Added as co-defendants were Rudolph ("Rudy") Epps and John Doe, a/k/a "Kenny." See Superceding Indictment in the Richmond prosecution, dated June 5, 2001. Rudy Epps was released from federal custody when the Richmond prosecution was dismissed, and the Government did not pursue any other federal charges against him after the 2001 dismissal or when it re-instated its federal prosecution against the Defendant in 2005.

an Agreed Discovery Order was entered between the Government and the Defendant pursuant to Rule 16(a) of the Federal Rules of Criminal Procedure, which detailed the Government's obligations in responding to discovery and exculpatory evidence requests.

On September 6, 2001, the Honorable United States District Judge Robert E. Payne held a hearing on several discovery motions, including a motion to dismiss for discovery misconduct.[6] There, Judge Payne found that the Government had committed "flagrant misconduct" relating to its late and non-production of constitutionally required and court-ordered discovery, including exculpatory evidence that the Government produced eight days before trial, although the Government had it in its possession for almost two years, and the results of DNA evidence analysis.[7]  See Transcript Hearing before Judge Payne, held on September 6, 2001, at 107-08 [hereinafter "9/6/01 Hearing Tr."], Def.'s Mot. Dismiss Disc., Ex. 1.  The exculpatory information consisted of police reports and witness interview summaries that identified a plausible alternative

_____

Transcript of Hearing, held on February 8, 2006, at 15.  Because the Government had no evidence that he was involved with the Virginia Beach robberies, Virginia Beach did not indict him on the two state charges with the Defendant.  Id.  Consequently, Epps remains free of all charges.  The Government did not follow up on identifying or pursuing "Kenny" during or after the Richmond prosecution.  Id. at 21-22; Transcript of Hearing, held on February 9, 2006, at 8-10, 14-21.

[6]These motions were: 1) Motion to Preclude Scientific Evidence, filed on August 28, 2001; 2) Motion to Dismiss the Superceding Indictment, filed on September 4, 2001; and a 3) second Motion to Dismiss and Motion Concerning Instructions, filed on September 4, 2001.

[7]Defendant filed several motions regarding DNA evidence in an effort to prompt the Government to comply with its Agreed Order, which required this information to be turned over to the Defendant on May 2, 2001.  However, the Government produced the DNA-related discovery first on May 25, 2001, on June 12, 2001, and on August 27, 2001, despite the fact that it had in its possession a substantial volume of results of DNA testing on and before May 2.  See Judge Payne's Memorandum Opinion, filed September 26, 2001, at 29-30.  In an attempt to resolve the DNA-related motions filed by the Defendant, the Government made promises to deliver the evidence when received, when, in fact, the information was already in the Government's possession.  Based upon these facts, Judge Payne found that the Government "completely disregarded [its] duty in this case.  It knew full well that the FBI has some DNA evidence and, whether by intent or gross indolence . . . did not timely deliver" the evidence.  Id. at 45.  Judge Payne concluded that it was "reckless to have asserted that the results and reports were not complete without verifying what was finished and what was not" and "unimaginable that the United States was unaware that meaningful use of the DNA evidence required access to it well in advance of trial."  Id.

perpetrator of the May 1, 1999 robbery of the Southside Bank in Franklin, Virginia, which Judge Payne considered to be of such highly exculpatory value that it would be obvious on its face to any lawyer or law enforcement officer.  Id.  Moreover, when the Government finally produced this exculpatory evidence on the eve of trial, among a discovery production of 891 pages of disorganized documents, the information that would permit identification and location of the witnesses had been redacted.  Id.  At the hearing, Judge Payne stated that he had "never seen, in ten years' time on the bench, . . . a more egregious failure to turn over what is so obviously exculpatory information that has an effect not only on the one count that it relates to directly, but it has the ripple effect of permitting a defendant to attack the theory that all robberies are committed with the same M.O."  Id. at 120.

In an order and memorandum opinion, filed September 26, 2001, Judge Payne issued a detailed criticism of the Government's failure to comply with its disclosure obligations [hereinafter "Judge Payne's Mem. Op."].  Def.'s Mem. Mot. Trans., Ex. 3.  Judge Payne found that the Government's failures, especially its failure to identify and turn over clearly exculpatory evidence, prejudiced the defense.  Judge Payne sanctioned the Government by precluding it from offering any DNA evidence at trial and was compelled to continue the trial from September 10 until November 28 to give the Government an opportunity to cure the prejudice arising from its late production.  9/6/01 Hearing Tr. at 36-50.  Judge Payne also ordered the Government to undertake an expansive discovery investigation and production by a deadline of September 20, 2001, including, inter alia, 1) going back to all Government files and files from every state and federal law enforcement agency that investigated the alleged offenses; 2) searching those files for any documents relating to the case; 3) producing to the Defendant all documents discovered during the search of all files that had not been previously produced; 4) producing all documents, photographs, videotapes and photo copies of tangible items seized from any defendant in the case;

5) providing all witness and exhibits lists that the Government intended to use at trial; and 6) certifying to Court that the Government had complied with this order [hereinafter "Judge Payne's Order"].[8]  See 9/6/01 Hearing Tr. at 108-112; Def.'s Mem. Mot. Trans., Ex. 3, at 1-2.  By a deadline of September 10, 2001, Judge Payne's Order also required the Government to turn over the addresses, phone numbers, and means of contacting each of the witnesses whose identifying information had been blacked out in the exculpatory materials that had previously been provided to the defense and to explain the organization of the 891 pages of information that the Government had produced in an indecipherable manner.  9/6/01 Hearing Tr. at 108-09.

Despite the Government's opportunity to cure its discovery failures, the Government continued to find itself out of compliance with Judge Payne's Order.  By the September 20th deadline, the Government had not certified that it searched all the files or provided exhibit and witness lists as directed.  See Transcripts of Hearings before Judge Payne, held on October 23 and October 30, 2001 [hereinafter "10/23/01 Hearing Tr." and "10/30/01 Hearing Tr."], Def.'s Mot. Dismiss Disc., Exs. 3, 6.  In addition, even as late as October 30, 2001, the Government still had not provided the names and addresses of the witnesses whose identifying information had been redacted.  Id.  More importantly, the Government was still discovering and producing exculpatory evidence up until October 19, 2001, which Judge Payne reviewed and found to be clearly exculpatory since the evidence, which included modus operandi evidence and eye-witness descriptions, indicated the existence of other alternative perpetrators.[9]  Id.

---

[8]Judge Payne's Order and Memorandum Opinion, dated September 26, 2001, memorialized his rulings from the bench on September 6, 2001.

[9]In the Richmond prosecution, part of the Government's modus operandi theory was that the subjects wore a dark mask with no eye or mouth cutouts and brandished handguns.  On September 3, 2001, the Government turned over an FBI 302 report of a witness to the December 24, 1998 robbery, "Ms. Earl," describing the bank robber as wearing what appeared to be a ski mask.  10/23/01 Hearing Tr. at 12.  The FBI report concluded that Ms. Earl was unable to provide further information.  Also provided on that date were two other FBI 302 reports, in which two other witnesses, "Ms. Lawrence" and "Ms. Godwin," described the robbers

In light of the ongoing discovery problems and late production of exculpatory evidence, Judge Payne held a hearing, which began on October 23, 2001, and was later continued on October 30, 2001, to determine whether dismissing the indictment with prejudice was warranted. See 10/23/01 and 10/30/01 Hearing Trs.  In discussing the impact of the Government's failure to identify and turn over exculpatory evidence, Judge Payne explained that the reason he ordered the Government to go back and search all the files and provide the names and addresses of all the witnesses was because "there had been a fundamental failure of Brady.  And I set out . . . to make sure every opportunity that the defendants had to investigate whether there were alternative perpetrators would be open to them."  10/30/01 Hearing Tr. at 10.  Judge Payne also informed the Government that he came very close to dismissing the case with prejudice due to the Government's fundamental failure to appreciate and abide by its constitutional duty to turn over exculpatory evidence.  Id.

However, one week before the continued trial was to commence, the Government moved to have the superceding indictment dismissed without prejudice.  On November 20, 2001, over the objection of the Defendant, Judge Payne granted the Government's motion.  Def.'s Mot. Dismiss Disc. (II), Ex. 4.  Prior to the dismissal, the Government communicated with the Virginia Beach prosecutor's office regarding its intent to dismiss the federal prosecution so as to allow Virginia Beach to obtain a warrant for Defendant's arrest and have the Defendant transferred into state

---

wearing masks and concluding that the witnesses could provide no further information.  Id.  On October 19, 2001, the Government produced other documents indicating that these three witness actually gave additional information to the FBI that conflicted with the Government's modus operandi theory.  Ms. Earl described the subject wearing a dark mask with holes in the eyes and mouth, Ms. Lawrence indicated that there was possibly a bandana on the subject's face, and Ms. Godwin described the suspect having a bandana, possibly dark brown in color, over his nose and mouth.  Id. at 15-17.  Judge Payne found that this additional evidence was Brady and Giglio material, especially when considered in light of the exculpatory evidence produced eight days before trial which described James White, a plausible alternative perpetrator whose modus operandi included wearing a handkerchief.  Id.  Yet when the Government tardily produced this information it indicated that it did not think that it qualified as exculpatory evidence.  Id. at 19.

custody to face charges on the two Virginia Beach robberies that were contained in the federal indictment [hereinafter "Virginia Beach prosecution"].  Transcript of Hearing, held on February 8, 2006, at 4-5 [hereinafter "2/8/06 Hearing Tr."]; Transcript of Hearing, held on February 9, 2006, at 50 [hereinafter "2/9/06 Hearing Tr."].  From then on, the prosecution became a state matter against the Defendant and the federal prosecution came to an end.  2/8/06 Hearing Tr. at 4-5; 2/9/06 Hearing Tr. at 20-21.

According to the testimony of FBI Special Agent Brad Bryant ("Agent Bryant"), who investigated the robberies and was the only case agent assigned to the Richmond prosecution, when the Government terminated the federal prosecution against the Defendant in 2001, the Government gave up on the multiple robberies and related charges and did not pursue any other leads or individuals who were suspected of being a part of the conspiracy.  2/8/06 Hearing Tr. at 4-7; 2/9/06 Hearing Tr. at 20.  Agent Bryant understood that he was not to pursue any further investigation and was directed to assist in the Virginia Beach prosecution based upon his prior investigation.  2/9/06 Hearing Tr. at 20.

Consequently, following the dismissal of the Richmond prosecution, Defendant was arrested by the City of Virginia Beach Police and Agent Bryant turned over the Government's investigation materials relating to the two Virginia Beach robberies.  On February 4, 2002, Defendant was indicted in the Virginia Beach Circuit Court on thirty-seven (37) charges, all of which related to the Virginia Beach robberies listed in the superceding indictment in the Richmond prosecution.  On February 18, 2002, twelve (12) of those charges were nolle prossed on grounds of double jeopardy.  Defendant's trial, which was originally scheduled for April 29, 2002, was continued thirteen times.  The last continuance was granted on July 11, 2005.  On or before that day, the Commonwealth decided that it would no longer pursue the Virginia Beach prosecution against the Defendant.  Before dismissing the indictment, the Virginia Beach

prosecutor notified the Government of the Commonwealth's intent to forego prosecution so that the Government could arrest the Defendant before the Commonwealth dismissed the case.  2/8/06 Hearing Tr. at 5; 2/9/06 Hearing Tr. at 60-61.

On July 11, 2005, the Government indicted Defendant in the Newport News Division for bank robbery offenses, all of which included offenses for which he was previously indicted in the Richmond prosecution [hereinafter "instant prosecution"].[10]  The instant Indictment, however, is not an exact replica of the indictment in the Richmond prosecution because the nineteen (19) robberies that are currently listed as overt acts underlying the conspiracy charge were originally charged as substantive robbery offenses in the Richmond prosecution.[11]  However, at the time the instant Indictment was filed, the statute of limitations barred all robberies as substantive offenses, with the exception of the two most recent robberies – the July 27, 2000 robbery of the BB&T Bank, located in Norfolk, Virginia, and the December 30, 2000 robbery of the Metro County

---

[10]In the instant Indictment, Defendant is charged with 1) Count One – Conspiracy to Commit Bank Robbery, in violation of 18 U.S.C. § 371; 2) Counts Two and Three – Bank Robbery, in violation of 18 U.S.C. § 2113; and 3) Counts Four and Five – Use of a Firearm During a Violent Crime, in violation of 18 U.S.C. § 924(c).  See Indictment, filed July 11, 2005.  (Doc. 2.)  As constituting the overt acts underlying the Conspiracy Count, Defendant is charged with conspiring to rob the following banks on the following dates: 1) James River Colonial Bank in Yorktown, Virginia on December 24, 1998; 2) First Virginia Bank in Hampton, Virginia on February 13, 1999; 3) Essex Savings Bank in Suffolk, Virginia on February 27, 1999; 4) First Virginia Bank in Glen Allen, Virginia on March 20, 1999; 5) Southside Bank in Franklin, Virginia on May 1, 1999; 6) Bank of Suffolk in Suffolk, Virginia on July 13, 1999; 7) F&M Bank in Richmond, Virginia on August 7, 1999; 8) Citizens & Farmers Bank in Williamsburg, Virginia on September 4, 1999; 9) Currituck Bank in Camden, N.C. on September 15, 1999; 10) Peninsula Trust Bank in Mattaponi, Virginia on October 16, 1999; 11) First Virginia Bank in York County, Virginia on December 18, 1999; 12) First Virginia Bank in Grafton, Virginia on January 29, 2000; 13) First Citizens Bank in Emporia, Virginia on March 22, 2000; 14) First Virginia Bank in Virginia Beach, Virginia on April 8, 2000; 15) Old Point National Bank in Williamsburg, Virginia on April 22, 2000; 16) First Virginia Bank in Virginia Beach, Virginia on June 10, 2000; 17) James River Bank in Newport News, Virginia on June 29, 2000; 18) BB&T Bank in Norfolk, Virginia on July 27, 2000; and 19) Metro City Bank in Richmond, Virginia on December 30, 2000.  Id.

[11]This statement is subject to one exception.  In the Richmond prosecution, Defendant was not charged with the substantive offense of armed robbery of the Bank of Currituck in Camden, N.C. on September 15, 1999, which is listed as one of the overt acts in the instant Conspiracy Count.  See Counts Three through Twenty-Three of the Superceding Indictment in the Richmond prosecution.  The September 15, 1999, robbery, however, was listed as one of the overt acts in the conspiracy charge in the Richmond prosecution.  See id., Count One.

Bank, located in Richmond, Virginia – which are the only two robberies that are listed as substantive offenses in the instant Indictment.

After the instant Indictment was filed, the Commonwealth nolle prossed the remaining state charges.  Defendant was then transferred to federal custody and his trial was scheduled for November 28, 2005, in Newport News.[12]  On August 19, 2005, the parties entered into a joint discovery order, pursuant to Rule 16 of the Federal Rules of Criminal Procedure.  (Doc. 8.)  On October 21, 2005, Defendant filed a Motion to Transfer Venue to the Richmond Division.  The Court held a hearing on the matter on November 8, 2005, and denied the Motion to Transfer.  See Court's Order and Opinion, entered November 10, 2005.  (Doc. 16.)  However, Defendant's Motion brought to the Court's attention the fact that a vast majority of the discovery in this case had not been produced to the Defendant.

The Government asserted that in order to comply with its discovery obligations in the instant prosecution and as imposed by Judge Payne's Order, the Government was proceeding on an "open file" policy.  See Transcript of Hearing, held on November 8, 2005, at 9 [hereinafter "11/8/05 Hearing Tr."].  However, as of the date of the hearing – twenty calender days before the scheduled trial – the Government's file was still located in Richmond and it had turned over only one envelope of documents upon Defendant's request.  Thus, the Court was required to intervene given the fact that virtually no efforts had been made to affirmatively produce any discovery within a matter of weeks before trial.  Accordingly, the Court ordered that the Government's file be made available to the Defendant in Newport News by 1:00 p.m. the following day, November

---

[12]At his arraignment on August 17, 2005, Defendant agreed to that trial date, which was beyond his speedy trial cut-off, because defense counsel believed that DNA evidence was involved, which would have required extra time to prepare given the history of the case and Judge Payne's rulings.  Defense counsel represented at the hearing that he did not realize, on August 17, 2005, that DNA evidence would not be used in this case due to its preclusion by Judge Payne in the Richmond prosecution.  The Government does not allege, nor does the Court find, that Defendant's agreement to a trial date after the statutory speedy trial cut-off in the instant prosecution waived his constitutional right to a speedy trial in this case.

9, 2005, for inspection by both counsel, and specifically ordered the file to include all discovery

referenced in Judge Payne's Order, as well as any other documents related to the instant

prosecution.  Id.

       On November 9, 2005, counsel met in Newport News as directed by the Court and

reviewed the file.  The discovery that was produced by the Government on that day amounted to

four banker boxes of documents and two car loads of physical evidence.  Govt.'s Resp. Mot.

Dismiss Disc. (I), at 3.  Nevertheless, during the course of the meeting, the parties discovered that

the file appeared to be incomplete, lacking potentially exculpatory evidence and other discovery

materials related to the charged offenses.  Id. at 3, 10; Def.'s Mot. Dismiss Disc. (I), at 5.  On

November 15, 2005, Defendant filed a Motion to Dismiss the Indictment, or in the Alternative, to

Compel Compliance with Previous Court Orders and to Extend the Trial Date, contending that the

Government was not in compliance with its obligations to produce exculpatory and other

evidence, as required by Brady v. Maryland, 373 U.S. 83 (1963), and Judge Payne's Order.  See

Def.'s Mot. Dismiss Disc. (I).  (Doc. 17.)

       The Court heard arguments in open court on November 17, 2005, and found that the

Government was not in compliance with its discovery obligations for the following reasons: 1)

numerous documents were found to be missing, unidentified or located with other FBI agents in

and outside of Virginia; 2) the Government could not certify that it had produced to the Defendant

all materials required to maintain the instant prosecution or required by Judge Payne's Order; and

3) there was reason to believe, based upon the incomplete state of the discovery file and the

Government's history of late and non-production of exculpatory evidence, that the file may be

missing potentially exculpatory evidence that had yet to be identified, located and produced.  See

Court's Order and Opinion, entered December 6, 2005 [hereinafter "Court's Discovery Order"].[13] (Doc. 23.)   The Court denied Defendant's Motion to Dismiss for discovery failures because the incomplete and indeterminate state of discovery, while unacceptable for trial, did not provide a sufficient basis for the Court to determine whether the Government's discovery failures caused actual prejudice to the Defendant or a substantial threat of same.

In order to ensure the Defendant a fair trial, the Court continued the trial until February 21, 2006, to provide the Government time to come into compliance with its discovery obligations.  Id. The Court further ordered the Government to comply with a comprehensive timetable for future discovery disclosures, which required the Government to 1) go back and search all federal and local police files for all discovery related to the instant offenses that would comply with Brady, Judge Payne's prior Order, and discovery required for the instant Indictment; 2) categorize and index all discovery in an organized and decipherable manner; 3) produce to Defendant all exculpatory evidence, and an index thereof, by December 19, 2005, and all remaining evidence, and an index thereof, by January 13, 2006; and 4) certify to the Court that the Government had timely complied with the Court's Discovery Order.  Id.

On December 19, 2005, the Government filed its Index of Exculpatory Evidence and Certification of Compliance pursuant to the Court's [Discovery] Order and produced its exculpatory discovery to the Defendant [hereinafter "Exculpatory Production"].  (Docs. 25, 26.) On January 13, 2006, the Government filed its Index of Evidence and Certification of Compliance with the Court's [Discovery] Order and produced the remaining discovery that the Government possessed in its files [hereinafter "Evidence Production"].  (Doc. 27.)  As a part of its December

---

[13]Although the Court had previously admonished the Government to produce discovery in accordance with Judge Payne's Order from the bench on November 8, 2005, the Court also adopted Judge Payne's Order as a part of its written Order and Opinion of December 6, 2005.

19, 2006, Exculpatory Production, the Government produced, for the first time in this case,

evidence related to the April 22, 2000, robbery of the Old Point National Bank in Williamsburg,

Virginia [hereinafter "York County report"].[14]   The evidence was included in a report from the

York County Sheriff's Office and revealed the following:

> On April 26, 2000, Officer Lucas of the York County Sheriff's Office
> spoke with the manager of Captain John Smith Inn, which is located
> approximately 5 miles from the Old Point Bank and on the same road.
> The manager told Officer Lucas that several people staying in room
> 150 at the Inn had left without paying their bill, and left several items
> in their room, including a box of ammunition, hand-drawn layouts of
> banks, a "plan" involving converting bank money to drugs, and birth
> certificates belonging to Latrell Veney and Antoinette Veney.

Def.'s Mot. Dismiss Disc. (II), at 4; see also Ex. 2 and Exculpatory Index reference no. 57.   The

Government explained that the report was provided to the Government when it went back to the

York County Sheriff's Office pursuant to the court-ordered search of police files and requested all

files or documents related to the robbery.

Defendant contends that this newly produced evidence, while perhaps technically

compliant with the Court's Discovery Order, represents the fourth time the Government has

discovered unproduced exculpatory evidence after being ordered by the Court and by Judge Payne

to go back and search all of its files for discovery that should have been produced to the

Defendant in 2001.   In addition, Defendant alleges that the Government's Exculpatory and

Evidence Production falls far short of its constitutional and court-ordered discovery obligations

and requires dismissal of this action.   Specifically, Defendant alleges that the Government has

failed to produce complete documents, failed to produce numerous documents and exhibits

material to defense preparation, and failed to produce and index the existing discovery in a

---

[14]This robbery is cited as an overt act in the Conspiracy Count.

decipherable manner.  See generally Def.'s Mot. Dismiss Disc (II).  Defendant also contends that the Government's ongoing discovery failures have prejudiced and prolonged this case to such a degree that Defendant's Sixth Amendment right to a speedy trial has been violated.

Since March of 2001, Defendant has been held in either state or federal custody awaiting trial on Defendant's alleged involvement with robberies that took place between 1998 and 2000. During this time, four separate prosecutors and four separate defense attorneys have been assigned to handle this case.[15]  In each phase of prosecution, each prosecutor and defense attorney has had to start virtually from the beginning to prepare this case and piece together the discovery.  Thus, a case that in the normal course of events would have gone to trial in the fall of 2001, remains pending before the Court with the status of discovery remaining a mystery and a new trial date yet to be determined.

## II. STANDARD OF REVIEW

It is well-established that dismissal of a criminal indictment is a harsh and drastic remedy for discovery related misconduct.  United States v. Morrison, 449 U.S. 361, 365-66 (1981); United States v. Derrick, 163 F.3d 799, 807-08 (4th Cir. 1998).  In considering the appropriate remedy for discovery violations the Court "must use the least severe sanction which will adequately punish the government and secure future compliance."  United States v. Hastings, 126 F.3d 310, 317 (4th Cir. 1997), cert. denied, 523 U.S. 1060 (1998).  In considering what remedy is appropriate for failing to timely produce required discovery,

a court must weigh the reasons for the government's delay and

_____

[15]In the Richmond prosecution, the Defendant was represented by one attorney and the Government was by represented two prosecutors for the Government: the first prosecutor either withdrew or was removed and was then replaced by the second prosecutor.  In the Virginia Beach prosecution, the Defendant was first represented by appointed counsel, then by retained counsel, and the Commonwealth was represented by a prosecutor for the Commonwealth.  In the instant prosecution, Defendant has been represented by appointed counsel and the Government has been represented by a prosecutor for the Government.

> whether it acted intentionally or in bad faith; the degree of prejudice,
> if any, suffered by the defendant; and whether any less severe sanction
> will remedy the prejudice and the wrongdoing of the government.

Id. at 317 (citing United States v. Maples, 60 F.3d 244, 247 (6th Cir. 1995)).  Nevertheless, in

some extreme cases, the Court has the discretion under its inherent supervisory power to dismiss

an indictment with prejudice for discovery failures.  Derrick, 163 F.3d at 806.  Likewise, the

Court has discretion to dismiss an indictment for unnecessary delay in bringing a defendant to trial

under the Court's supervisory power and under Federal Rule of Criminal Procedure 48(b).[16]

United States v. Goodson, 204 F.3d 508, 513-14 (4th Cir. 2000).  According to the United States

Court of Appeals for the Fourth Circuit in United States v. Goodson, Rule 48(b)

> not only allows a court to dismiss an indictment on constitutional
> grounds, see Pollard v. United States, 352 U.S. 354, 361 n.7 (1957)
> (noting that Rule 48(b) provides for enforcement of the Sixth
> Amendment's speedy-trial right), but it also restates the court's
> inherent power to dismiss an indictment for lack of prosecution where
> the delay is not of a constitutional magnitude, see Fed. R. Crim. P.
> 48(b) advisory committee note (pointing out that the rule restates the
> "inherent power of the court to dismiss a case for want of
> prosecution").

Id. at 514.  However, in the exercise of its discretion, the Court may not dismiss an indictment for

either discovery failures or for unnecessary delay "either under Rule 48(b) or under its supervisory

power, unless the violation caused prejudice to the defendant or posed a substantial threat

thereof."  Goodson, 204 F.3d at 514 (citing Derrick, 163 F.3d at 806).

In contrast, a finding that the Defendant's Sixth Amendment right to a speedy trial has

been violated requires that the indictment be dismissed with prejudice.  Strunk v. United States,

---

[16]Federal Rule of Criminal Procedure 48(b) provides:
> If there is unnecessary delay in presenting the charge to a grand jury or in filing
> an information against a defendant who has been held to answer to the district
> court, or if there is unnecessary delay in bringing a defendant to trial, the court
> may dismiss the indictment, information or complaint.

412 U.S. 434, 440 (1973); see also McNeely v. Blanas, 336 F.3d 822, 832 (9th Cir. 2003).  The

Speedy Trial Clause of the Sixth Amendment guarantees that "[i]n all criminal prosecutions, the

accused shall enjoy the right to a speedy . . . trial . . . ."  U.S. Const. amend. IV.[17]  This is a

fundamental right and "has its roots at the very foundation of our English law heritage."  Klopfer

v. North Carolina, 386 U.S. 213, 223 (1967).

In Barker v. Wingo, 407 U.S. 514 (1972), the United States Supreme Court established a

framework for evaluating a Sixth Amendment speedy trial violation.  The Court must balance four

factors: 1) the length of the delay; 2) the reason for the delay; 3) the defendant's assertion of his

right to a speedy trial; and 4) the degree of prejudice to the defendant.  Barker, 407 U.S. at 530.

The Court in Barker formulated the four-factor balancing test as a functional approach to give

shape to the "vague" and "amorphous" nature of the right in question.  Barker, 407 U.S. at

521-22.  Thus, consistent with this approach, the Barker Court noted that none of the factors is

"either a necessary or sufficient condition to the finding of a deprivation of the right of speedy

trial.  Rather, they are related factors and must be considered together with such other

circumstances as may be relevant."  Id. at 533 (observing that there is no "talismanic quality" to

the factors).

### III. ANALYSIS

The ultimate issues regarding discovery and speedy trial are inextricably intertwined,

especially regarding the extraordinary length of time that has passed since the federal case against

Defendant was initiated and the degree to which the federal discovery problems contributed to

that delay.  Moreover, the issues regarding the prejudice resulting from discovery failures is

encompassed by the Court's consideration of the prejudice related to Defendant's right to a speedy

---

[17]Defendant does not allege that his rights were violated under the Speedy Trial Act, 18 U.S.C. §§ 3161-3174.

trial.  Thus, the Court's analysis of whether the Government's discovery failures warrant a dismissal is subsumed in the Court's analysis of whether Defendant's right to a speedy trial has been violated.  For that reason, the structure of the Court's analysis centers upon whether Defendant's right to a speedy trial has been violated by evaluating the facts of this case under the four-pronged Barker balancing test, in addition to other relevant factors.

**A. Length of the Delay**

The first inquiry regarding the length of the delay is also a threshold requirement because "'simply to trigger a speedy trial analysis, an accused must allege that the interval between accusation and trial has crossed the threshold dividing ordinary from presumptively prejudicial delay.'"  United States v. Woolfolk, 399 F.3d 590, 597 (4th Cir. 2005) (quoting Doggett v. United States, 505 U.S. 647, 651-52 (1992)).  In order to trigger Sixth Amendment review under Barker, the Defendant must generally have suffered at least a one-year delay, calculated from the earlier of his arrest, indictment, or other official accusation.  Doggett, 505 U.S. at 655; see also Woolfolk, 399 F.3d at 598.

Ordinarily, determining the length of the delay suffered by the accused is a simple matter of calculating "the length of the delay between arrest or indictment, on the one hand, and the date of trial, on the other hand."  RaShad v. Walsh, 300 F.3d 27, 33 (1st Cir. 2002).  Based upon the current state of discovery, the date in which this case could come to trial is currently undetermined.  However, there is no dispute that the Defendant has been continuously held in either federal or state custody on bank charges since March 2001 without the benefit of standing trial in any forum.  Thus, the overall delay between the Defendant's initial arrest on federal charges and his eventual trial will necessarily amount to over five years.

The Government contends that the delay experienced in this case amounts to only 154

-16-

days.  Govt.'s Resp. Speedy Trial at 4.  In arriving at this number, the Government apparently calculates only the time for which it feels that it could be held directly responsible.  This narrow method of calculation confuses the appropriate inquiry regarding the first and second <u>Barker</u> factors – the length of the delay and the reason for the delay.  The appropriate method is to first assess the overall delay experienced by the accused; then, the second factor of the <u>Barker</u> balancing test allows the Court to evaluate the reason for the delay to appropriately isolate the Government's relative responsibility for the delay.

In furtherance of this narrow view, the Government argues that the delay experienced in Virginia Beach is not relevant to the present case, citing <u>United States v. Grimmond</u>, 137 F.3d 823, 828 (4th Cir. 1998) and <u>United States v. Thomas</u>, 55 F.3d 144, 151 (4th Cir. 1995).  Govt.'s Resp. Speedy Trial at 4.  However, the Government's reliance on these cases is misplaced.  While relevant to assessing the reason for the delay when a federal prosecution follows a pending state prosecution, they do not stand for the principle that the delay experienced in state detention is irrelevant to the overall delay.  Indeed, the Fourth Circuit in <u>Thomas</u> noted that "we do not here hold that a pending state prosecution in any sense tolls the running of the Sixth Amendment period of delay . . . ."  <u>Thomas</u>, 55 F.3d at 151.

On the other hand, having been in state custody prior to his indictment should not factor into the delay unless the state "detention was related to the charges on which his speedy trial claim is based."  <u>RaShad</u>, 300 F.3d at 36.  In this case, Defendant's initial arrest was the start of a continuous restraint on his liberty and all subsequent indictments are related to the same set of bank robberies originally indicted in 2001.  Thus, the Court FINDS that Defendant's initial arrest in March of 2001 triggered the relevant period of delay and that all three phases of his detention, including the Virginia Beach detention, factors into the overall five-year delay experienced by the

Defendant.  See Acha v. United States, 910 F.2d 28, 30 (1st Cir. 1990); United States v. Stead,

745 F.2d 1170, 1172 (8th Cir. 1984).

**B. Reason for the Delay**

In evaluating the reason for the delay, it is important to note that the Court's inquiry "is

not a search for a blameless party." Wilson v. Mitchell, 250 F.3d 388, 395 (6th Cir. 2001).

Instead, the Court must determine "whether the government or the criminal defendant is more to

blame for [the] delay." Doggett, 505 U.S. at 651; see also United States v. Schreane, 331 F.3d

548, 554 (6th Cir. 2003).  The Government bears the burden for explaining the reason for the

delay since the Government bears the ultimate burden of bringing the accused to trial.  Barker,

407 U.S. at 527, 531; see also Jackson v. Ray, 390 F.3d 1254, 1261 (10th Cir. 2004).  According

to the Fourth Circuit in Grimmond, in evaluating the reason for the delay, the Court

> must keep in mind that "different weights should be assigned to
> different reasons." Barker, 407 U.S. at 531.  The Supreme Court
> recognizes that some reasons for delaying a trial are improper, e.g.,
> harassment.  See United States v. Marion, 404 U.S. 307, 325 (1971).
> It should go without saying that improper reasons for delaying a
> defendant's trial are "weighted heavily against the government."
> Barker, 407 U.S. at 531.  The Supreme Court also recognizes that
> some reasons for delaying a trial are neutral, e.g., an understaffed
> prosecutor's office.  See Strunk v. United States, 412 U.S. 434, 436
> (1973).  Although labeled neutral, "the ultimate responsibility for such
> circumstances must rest with the government rather than with the
> defendant." Barker, 407 U.S. at 531.  Finally, the Supreme Court
> recognizes that some reasons for delaying a trial are valid, e.g., a
> missing witness.  See id.  Valid reasons for delaying a trial are
> weighted in favor of the Government.

Grimmond, 137 F.3d at 828.  Governmental negligence is also considered a neutral reason that

weighs against the Government, though less heavily than a bad faith delay.  Barker, 407 U.S. at

531; see also Schreane, 331 F.3d at 556.  However, governmental negligence is weighted more

heavily against the Government as the delay increases.  <u>Doggett</u>, 505 U.S. at 657; <u>United States v. Serna-Villarreal</u>, 352 F.3d 225, 232 (5th Cir. 2003).

To properly analyze the reason for the delay in this case, it is necessary to separately evaluate the relative responsibility for each phase of prosecution that produced a delay of over five years in bringing the Defendant to trial.  The three relevant phases are: 1) the Richmond prosecution – the time between the Defendant's initial arrest in March 2001 until his dismissal in November 2001; 2) the Virginia Beach Prosecution – the time between the federal dismissal in November 2001 until the state dismissal in July 2005; and 3) the instant prosecution – the time between his re-indictment in July 2005 until the present.

<u>      1. Richmond prosecution</u>

The record reveals that the principle reason for the delay associated with the Richmond prosecution was the Government's well-documented misconduct and ongoing discovery failures as discussed in Judge Payne's findings in his September 26, 2001 memorandum opinion and in the hearings held on October 23, 2001 and October 30, 2001.  This Court FINDS that these failures clearly establish that the Government was grossly negligent in causing the delay experienced in the Richmond prosecution.  One of the most egregious failures was the Government's failure to turn over clearly exculpatory evidence despite the fact that the evidence was in the Government's possession for almost two years.  For that reason, Judge Payne found that the Government acted with "reckless disregard" of its constitutional obligations and issued a detailed discovery order designed to ensure that the Government would timely produce the discovery required to guarantee the fairness of the trial.  Judge Payne's Mem. Op. at 47; 9/6/01 Hearing Tr. at 108-112.

Specifically, Judge Payne ordered the Government to reexamine all federal and local police department records, reexamine all of its files, and produce any discovery that had not been

-19-

previously produced by September 20, 2001.  9/6/01 Hearing Tr. at 108-09; Judge Payne's Order

at 1-2.  While such an expansive and all-encompassing court order should not have been required

to prompt the Government to turn over exculpatory evidence, the Government's inability to

appreciate or abide by its constitutional obligations required significant judicial intervention in

light of the threat of prejudice to the Defendant.  Moreover, doubt is cast over the entire

subsequent discovery process by the Government's repeated failure to produce required discovery.

Judge Payne's Mem. Op. at 22, 36-37.

     Because the Government had repeatedly represented to the Defendant and the court that it

was in compliance with its discovery obligations, when, in fact, it clearly was not, Judge Payne

also ordered the Government to certify to the court by the September 20th deadline that the

Government had complied with his order.  Sometime after Judge Payne issued his detailed

discovery order, the prosecutor for the Government was replaced.  On September 25, 2001, the

new prosecutor sent a letter to Defendant, which he later copied to the Court, which purported to

be some type of certification that the Government had complied with Judge Payne's Order.

However, the second prosecutor's "certification" relied in large part upon the sufficiency of the

first prosecutor's efforts *prior* to the September 6, 2001 hearing, the insufficiency of which were

the well-documented basis for the Judge Payne's Order.  10/30/01 Hearing Tr. at 12-13.

     The inaccuracy of this certification is demonstrated by the fact that the Government was

continuing to discover and produce exculpatory evidence up until the hearing on October 23,

2001.[18] Id.; 10/23/01 Hearing Tr. at 12-20.  In some instances, additional information had been

---

[18]For example, on September 25, 2001, the Government produced a witness statement, which described one of the fleeing robbers of the March 22, 2000, robbery of the First Citizens Bank in Emporia, Virginia, as being a white male although the Government contended that two black males committed the robbery.  10/23/01 Hearing Tr. at 12-20.  Then again, on October 19, 2001, the Government produced another statement from the same witnesses that provided greater detail in their descriptions, which conflicted with the Government's theory

recovered from local police files, and in others, information was discovered after having been mislaid in the United States' Attorney's Office.  Id. at 12-23.  At the October 30, 2001 hearing, the prosecutor represented that he was going to have all original records overnighted from every local jurisdiction so that he could "collect them all in one place so there can be no doubt that the universe of local documents is in one place."  Id. at 23.  However, despite the Government's representations going forward, the Government has presented no evidence that it had come into compliance with Judge Payne's Order when it sought to have the Richmond prosecution dismissed in November 2001.

While the Court does not find evidence of intentional misconduct or a bad faith effort to suppress evidence on the part of the Government, Judge Payne's orders and hearings are replete with findings of negligence with respect to the Government's handling of the discovery and exculpatory evidence.  Thus, the record makes it abundantly clear that the Government was grossly negligent in its handling of discovery in the Richmond prosecution.  Accordingly, the Court FINDS that the delay associated with the Richmond prosecution is weighted heavily against the Government.  Doggett, 505 U.S. at 657.

2. Virginia Beach Prosecution

The delay associated with the Virginia Beach prosecution constitutes roughly two-thirds of the overall elapsed time.  The Government presented little or no evidence to account for this three-and-a-half year delay, beyond 13 exhibits that purport to explain each continuance ordered in the Virginia Beach prosecution.  However, these exhibits provide a scant explanation for the continuances.  Govt.'s Mot. Speedy Trial, Exs. 1-13.  Five of these continuances were on motion of the Defendant with the Commonwealth concurring, four on joint motion, one by Defendant

---

that the robbers wore dark masks with no eye or mouth cutouts.  Id.; see also supra footnote 9.

with the Commonwealth objecting, and one by the Commonwealth.[19]  See Gov't.'s Resp. Speedy

Trial at 2; Exs. 1-13.  Based upon these exhibits, the Government attempts to attribute the

Defendant with the full responsibility for the delay experienced in Virginia Beach.  Id.  While a

slight majority of those continuances were upon motion of the Defendant, the testimony of the

prosecutor assigned to the Virginia Beach prosecution revealed that a central subject of these

continuances were problems with federal discovery materials, which led to a significant amount of

pretrial discovery motions.[20]  According to the prosecutor's testimony, the federal discovery issues

were also a significant factor in the prosecutor's decision to dismiss the case.[21]  Based upon the

minimal evidence presented to address the issues underlying these continuances, the Court cannot

attribute the responsibility for the delay associated with the discovery problems or the

continuances to the Defendant.

       The Government presented oral argument that its reading of the case law indicated that the

Government could not be held responsible for the problems in Virginia Beach unless it was

relying on the state as its agent.  See 2/8/06 Hearing Tr. at 41-42.  The Government has not

supplied, and the Court has not located, the case law to which the Government referred.

However, assuming its existence, any agency doctrine would not assist the Government in

---

       [19]In two instances, the Government's exhibits do not indicate which party moved for a continuance. See Gov't.'s Resp. Speedy Trial at 2, Exs. 2, 7.

       [20]The prosecutor for the Commonwealth testified that "there had been extensive motion practice," which was the reason for the numerous continuances in the Virginia Beach prosecution.  2/9/06 Hearing Tr. at 41.  Defense counsel "wanted discovery regarding other bank robberies in other jurisdictions. . . , discovery regarding the cooperating accomplices, plea agreements, [and] discovery relating to the FBI lab's DNA analysis."  Id. at 42.

       [21]According to the prosecutor, the Commonwealth decided to dismiss the case because it was "becoming more and more a federal case being tried in state court."  2/9/06 Hearing Tr. at 48.  "[I]t seemed to be becoming more and more a question of what the federal authorities had done before we even got the case."  Id. "I wasn't as familiar with what had happened in the U.S. Attorney's office in Richmond, or the FBI labs, or the FBI officers, . . .  I thought the federal authorities would be better able to handle those questions."  Id. at 64-65.

avoiding responsibility for the Virginia Beach delay.  The undisputed facts are that the FBI case agent for the federal prosecution served as the only case agent for the Virginia Beach prosecution and that the evidence in that case consisted of the federal evidence that was provided to Virginia Beach by the FBI after the Richmond prosecution was dismissed.  2/8/06 Hearing Tr. at 4-5; 2/9/06 Hearing Tr. at 66.  There is no evidence that the federal or local authorities conducted further investigation during the pendency of the Virginia Beach prosecution, and the Government has not pointed to any additional discovery materials uncovered during this three-and-a-half year period.  Moreover, arrangements were made in November 2001 between the Government and the Commonwealth that Defendant would be turned over to the Commonwealth before the federal prosecution in Richmond was dismissed; then again in July 2005, arrangements were made between the Commonwealth and the Government that Defendant would be turned over to the Government before the Virginia Beach prosecution was dismissed.  2/8/06 Hearing Tr. at 4-5; 2/9/06 Hearing Tr. at 50, 60-61.  These cooperative efforts to prosecute the Defendant clearly indicate that the federal Government was not acting independently of the Commonwealth.

Another fact that causes the Court to find that the Government relied upon the Commonwealth as a surrogate to bring the Defendant to trial is that the Government completely abandoned all charges in 2001, except the two Virginia Beach counts, and it expressed no intent to ever bring the Defendant to trial on the remaining charges.  At the November 17, 2005 hearing, the prosecutor for the Government explained that after the 2001 dismissal "there was no thought that the case would ever come back to the United States.  Virginia Beach had taken it over . . . ." Transcript of Hearing, held on November 17, 2005, at 14 [hereinafter "11/17/05 Hearing Tr."]; see also 2/9/01 Hearing Tr. at 91.  The Government argues that its decision to re-indict the Defendant over three-and-a-half years after the dismissal in 2001 was nevertheless legitimate.  In

-23-

support, the Government cites Grimmond, 137 F.3d at 828, and Thomas, 55 F.3d at 151, for the proposition that "waiting" to indict the Defendant after the Virginia Beach prosecution had concluded is a "valid" reason for prosecutorial delay under Fourth Circuit law.  Govt.'s Resp. Speedy Trial at 4.

In Grimmond and Thomas, the Fourth Circuit addressed whether waiting for the state court to conclude was a valid reason for delay where the accused was engaged in a pending state prosecution before being indicted in the federal system.  Grimmond, 137 F.3d at 828; Thomas, 55 F.3d at 151; see also United States v. Schreane, 331 F.3d 548, 554 (6th Cir. 2003) (where prosecution originated in state court, the Government was not at fault for delaying its prosecution until the state court concluded).  In Grimmond, the Fourth Circuit observed that "[w]hen a defendant violates the laws of several different sovereigns, . . . at least one sovereign, and perhaps more, will have to wait its turn at the prosecutorial turnstile.  Simply waiting for another sovereign to finish prosecuting a defendant is without question a valid reason for delay."[22]  137 F.3d at 828.

Reliance on Grimmond and Thomas to validate the delay is inapplicable to the undisputed facts of this case.  Unlike Grimmond and Thomas, this case originated as a federal prosecution, which was turned over to the Commonwealth when the federal case failed.  Moreover, it does not follow that "waiting" for the Commonwealth to finish prosecuting the Defendant was, in fact, the reason that the Government filed the instant Indictment in July 2005.  As acknowledged by the Government, it was not "waiting" for the state case to be concluded; rather, it had abandoned the case to the Commonwealth and had no thought that it would ever come back to the Government.

---

[22]The legitimacy of this prosecutorial deference "is rooted in the respect accorded to a custodial sovereign to resolve its criminal proceedings before relinquishing custody to another jurisdiction. This practice also can be understood in terms of the orderly and efficient prosecution of cases in our dual system of criminal justice." Schreane, 331 F.3d at 555.

The inference drawn by the Court from the totality of these facts is that the Government was relying upon the Commonwealth as a surrogate to bring the Defendant to trial.[23]

Although the Court does not infer any intentional misconduct by the abandonment of the charges outside of Virginia Beach, its delay exacerbated the effects of the negligence involved in the Richmond prosecution.  Doggett, 505 U.S. at 657.  In Dickey v. Florida, 398 U.S. 30, 52 (1970), the Supreme Court observed that "[a] negligent failure by the government to ensure speedy trial is virtually as damaging to the interests protected by the right as an intentional failure . . . . Thus the crucial question in determining the legitimacy of governmental delay may be whether it might reasonably have been avoided – whether it was unnecessary."  In this case, the Government has offered no explanation for why it waited over three-and-a-half years to indict the Defendant on the instant charges when only two overt acts of the instant Indictment were the subject of the Virginia Beach prosecution.[24]  Thus, the three-and-a-half year delay is attributed to the Government and the Government cannot avoid responsibility by claiming it was waiting for the Commonwealth.  The Court FINDS that the Government's abandonment of the instant charges, at least for three-and-a-half years, is an independent reason to attribute the Government with responsibility for this delay.

3. Instant prosecution

Defendant argues that the delay experienced in the instant prosecution is a direct result of the Government's continued failure to appreciate and abide by its constitutional and court-ordered

---

[23]It should be noted that in the timeframe of 2001 and 2002, defendants involved in many of the same bank robberies were simultaneously prosecuted in state and federal courts.  See 2/8/06 Hearing Tr. at 13-15; United States v. Hardison, Docket No. 3:01cr112 (E.D. Va. 2001); United States v. Boone, Docket No. 3:01cr112 (E.D. Va. 2001); see also supra footnote 3.

[24]The two alleged robberies which were the subject of the Virginia Beach indictment are two of the nineteen robberies cited as overt acts in the instant Conspiracy Count, but not the subject of a substantive count.

discovery obligations.[25]  See Def.'s Mot. Speedy Trial at 7.  At the outset, the Court notes that upon filing the instant Indictment, the prosecutor for the Government inherited an extraordinary burden.  Even without considering the impact of the discovery problems in Richmond and Virginia Beach, the prospect of handling a case that has been previously handled by three prior prosecutors presents an onerous burden.  As the Government conceded, it is extremely difficult for an attorney to prepare a case and attempt to piece it together when it has been handled by other attorneys over a period of years.  It is also significant that the Government, after having originally indicted in Richmond, chose to re-indict in a different division, with different judges and with a different prosecutor and case agent.[26]  Moreover, there is no evidence that the prosecutor in the instant prosecution received any significant assistance from the prosecutors assigned to the case in Richmond or Virginia Beach, although any assistance the Virginia Beach prosecutor could supply is more limited in that only two of the nineteen robberies contained in the instant Indictment were charged in Virginia Beach.

In any other case, these conditions would constitute an unusual burden; in this case, they are compounded by the discovery problems in the Richmond prosecution and the absence of any demonstrated effort by the Government to cure the state of the discovery after the case was dismissed in November 2001.  Thus, by the time the case had been assigned to the fourth

---

[25]Defendant also suggests that the reason for the present delay can be attributed to governmental bad faith, such as intentional delay in attempting to keep the Defendant in custody, vindictive prosecution as punishment for Defendant's vigorous motions practice in attempting to secure the discovery to which he is entitled, and improper forum-shopping.  Def.'s Mot. Dismiss Disc. (II), at 8-9; see also Def.'s Mot. Vind. Pros. Defendant infers impropriety from a variety of facts, including the following: 1) Rudy Epps, who was originally indicted with Defendant in Richmond remains free of all charges after the federal dismissal in 2001; and 2) for reasons that are not apparent, the Government re-indicted Defendant in Newport News instead of in Richmond where this case originated and where virtually all of the discovery was located.  Without more, these facts do not support a finding that the Government acted with an intentional, bad faith purpose.

[26]Although neither the federal prosecutor nor Agent Bryant are now available, having been assigned to other positions, their absence doesn't detract from the burden placed upon the new prosecutor and case agent in having to pick up the pieces from a stale and negligently handled case.

prosecutor in 2005, it was virtually impossible for the Government to cure the problems associated with delay, turnover, and discovery.

In October 2005, it first came to this Court's attention that discovery continued to be a problem.  Although the Government had re-indicted Defendant in the Newport News Division in July 2005, as of November 8, 2005, twenty calender days before the scheduled trial, the discovery materials were still located in Richmond.  It also appeared to the Court that no significant effort had been made by the Government to comply with its discovery obligations since the Richmond prosecution was dismissed on November 20, 2001.  Indeed, the Government argued that the discovery materials in Richmond were complete as of that date, despite overwhelming evidence to the contrary.  The very reason for the motion to dismiss in Richmond was the Government's inability to comply with Judge Payne's discovery order.  See Government's Reply Concerning Its Motion to Dismiss [the Richmond prosecution] at 2, Def's. Mot. Dismiss Disc. (II), Ex. 3; 2/8/09 Hearing Tr. at 3; see also 10/23/01 and 10/30/01 Hearing Trs.  Accordingly, the Court ordered the Government to transfer the file to Newport News and produce all discovery required by Judge Payne's Order and in the instant prosecution by November 9, 2005.

On November 9, both Defendant and the Government agreed that the discovery file was incomplete, lacking inter alia, items processed for DNA, some transcripts of witness testimony, all documents relating to three separate robberies, and other documents which might be exculpatory.  Govt.'s Resp. Mot. Dismiss Disc. (I), at 3, 10; Def.'s Mot. Dismiss Disc. (I), at 7-8. When the deficiencies in the discovery became apparent to the parties, the Government attempted to contact those involved with the original federal prosecution to reexamine the status of the Government's efforts to comply with Judge Payne's court-ordered production and certification, and to identify and locate items not found in the file.  Govt.'s Resp. Mot. Dismiss Disc. (I), at 3-4,

7-10.  Despite its prior representation, in its response to Defendant's Motion to Dismiss for

Discovery Failures, the Government stated that it could not represent that it was in compliance

with Judge Payne's Order.[27]  Id. at 3.  Indeed, at the time the Government filed its brief, the

Government admitted it did not know whether or not the Government had complied with Judge

Payne's Order prior to the 2001 dismissal.  See id; 11/17/05 Hearing Tr. at 15.

On November 17, 2005, the Court held a hearing to address Defendant's first Motion to

Dismiss for Discovery Failures.  At the hearing, the Government represented that it "believes it

complied with Judge Payne's order" and that it would "file an affidavit, which we intend to file,

saying that at the time of the dismissal [the outgoing prosecutor in the Richmond prosecution]

believed he had met all of Judge Payne's requirements, and Special Agent Bryant personally went

to each of the various police departments to recover all of their files, and . . . he will say he turned

over all of the files that he had retrieved from every one of the police departments . . . [and] that

the outgoing prosecutor in the Richmond prosecution was presenting an affidavit indicating that

all documents had been turned over."  Id. at 19.  However, neither Agent Bryant nor the outgoing

prosecutor in Richmond filed any affidavit stating that the Government was in compliance with

Judge Payne's Order when the Defendant was re-indicted in Newport News, nor did the

Government present any other evidence to that effect.

Similarly, in the Richmond prosecution, the Government repeatedly represented that it was

in compliance with its discovery obligations, but could not demonstrate to Judge Payne that it

---

[27]The Government stated as follows:

> While the Government has taken every effort to accommodate the defendant's requests for discovery, the volume of material makes it almost impossible for the attorney for the Government to make firm representations concerning the content of the files.  The original case agent and the Managing Assistant United States Attorney for the Richmond Office have both been consulted in an effort to determine the status of [the] case at the time of dismissal . . . ."

Govt.'s Resp. Mot. Dismiss Disc. (I), at 3.

was.  In fact, the record reflects that the Government's purported certification of compliance relied largely upon the efforts of the first prosecutor in the in the Richmond prosecution, whose failure to identify and turn over exculpatory evidence precipitated Judge Payne's Order.  The obvious inadequacy of this "certification" was also confirmed by the fact that the Government continued to find additional exculpatory evidence that had not been produced.  Judge Payne addressed the continuing Government discovery failures in the October 30, 2001 hearing, at which the Government represented that it was going to take additional steps to make the file complete.  However, as of the dismissal in November 2001, there is no indication that the Government had done so.  In fact, at the time the Government represented in the instant prosecution that it believed the outgoing attorney and case agent had complied with Judge Payne's Order, no additional research or investigation had taken place since the case was dismissed in 2001.  Thus, just as in the Richmond prosecution, the Government continued to represent that it was in compliance with its discovery obligations, but it could not demonstrate to the Court that it was.

At the November 17, 2005 hearing, the Government represented that "the only way [it] could be 100 percent sure that [it has] every document from every police department is to get back to them and do it again." Id. at 28.  Based upon the incomplete and disorganized state of the discovery at the time of the hearing, the Court found that, due to the Government's evident non-compliance, the Government would be required to do exactly that.  See Court's Discovery Order at 9, 14.  Thus, the Court ordered the Government to comply with a comprehensive and detailed timetable for all future discovery production.  Specifically, the Government was ordered to go back to all police departments, search all the files, and produce and index all exculpatory evidence by December 19, 2005, and all remaining evidence by January 13, 2006. Id. at 14.

The Court's all-encompassing Discovery Order was designed to ensure that the

Government would timely produce all exculpatory evidence and produce all other discovery required for a fair trial in an understandable format.  However, based upon the evidence heard by the Court on February 8 and 9, 2006, the Government's Exculpatory and Evidence Production pursuant to the Court's Discovery Order confirms that the Government was still not in compliance with either Judge Payne's Order or this Court's supplementary order.

There are two prominent examples of untimely discovery.  The first of the two examples is yet another piece of evidence that should have been discovered the first time around.  A York County police report reveals that two individuals, other than the Defendant or his co-defendants in the Richmond prosecution, were suspected of committing the April 22, 2000, robbery of the Old Point National Bank in Williamsburg, Virginia.  Although the production of the York County report could be considered technically compliant with this Court's Discovery Order, the Government's failure to produce the York County report until December 2005 is clearly negligent in light of its facially exculpatory nature.  The proximity to the robbery both in time and place, as well as the evidence found, including maps, guns and masks, clearly demonstrate that this report should have initially been turned over to the Defendant as exculpatory evidence in the Richmond prosecution.[28]  However, the Defendant was not made aware of the existence of these two other suspects until the Court ordered the Government to go back and search its files for unproduced evidence, despite the fact that the report became known to law enforcement over six years ago.

As to why this report was not previously produced, the Government indicated that upon suspicion that the occupants might be related to the Williamsburg robbery, York County "investigated the matter, conducted interviews, including the suspects, and appear to have been

---

[28]Despite the facially exculpatory nature of the York County report, the Government asserted that it was turned over only out of an "abundance of caution."  Govt.'s Resp. Mot. Dismiss Disc. (II), at 4.  However, at oral argument the Government conceded that the evidence could be considered exculpatory.  2/9/06 Hearing Tr. at 107.

satisfied with the answers concerning their whereabouts at the time of the robbery." Govt.'s Resp. Mot. Dismiss Disc. (II), at 3-4.

This is not the first time in this series of prosecutions that the Government has failed to produce exculpatory evidence based on a unilateral determination as to its relevance. In the Richmond prosecution, the Government did not produce clearly exculpatory evidence until the eve of trial, which Judge Payne described as "police reports and witness interview summaries that identify a plausible alternative perpetrator [James White] of the robbery committed on May 1, 1999, which, when considered with other evidence turned over . . . suggests the existence of another group of robbers operating in the same areas and under a similar modus operandi." Judge Payne's Mem. Op. at 22-23. There, the Government defended its late production as follows: "the FBI agent forgot about this exculpatory information because he long ago has satisfied himself that White and his supposed group has not committed the robbery on May, 1999, or any of the others here at issue."[29] Id. at 24. Judge Payne rejected this defense, stating that "it is not for law enforcement officers or prosecutors to determine whether exculpatory evidence should or should not be believed. That is the function of the jury. . . . [and] does not justify the failure to turn over that information. . . ." Id. at 51.

This Court takes the view, as did Judge Payne in 2001, that it is not within the investigators' or prosecutors' discretion to decide not to produce evidence of this caliber based upon their unilateral determination as to its relevance. Fundamental trial fairness demands that the Defendant be allowed to perform an independent investigation and to present the evidence to

---

[29]In fact, as later acknowledged by the prosecutor in the 2001 action, and as verified by Agent Bryant, White was actually arrested for committing the May 1, 1999, robbery and was in jail for the summer of 1999. 10/30/01 Hearing Tr. at 26; 2/8/06 Hearing Tr. at 35. In addition, evidence was produced in October 2001, which could tie White to the January 29, 2000, robbery of the First Virginia Bank in Grafton, Virginia, and the February 13, 1999, robbery of the First Virginia Bank in Hampton, Virginia. 10/23/01 Hearing Tr. at 22-26.

the jury, if he so chooses.  It is then for the jury to determine whether the alternative theories are credible.

While it is clear that the Government in the Richmond prosecution was continuing to produce exculpatory evidence up until it sought to have the Richmond prosecution dismissed in November 2001, there is no reasonable explanation for why the Government produced the York County report for the first time in the instant prosecution over four years after discovery problems arose in the Richmond prosecution.  Although the existence of this evidence appears to have taken the federal Government by surprise, the Government was under a pre-existing duty to search for and produce all evidence related to the charged offenses, whether located in the Government's file or any local police files.[30]  Thus, not only does the late production of the York County report demonstrate a lack of compliance with Judge Payne's Order, it also demonstrates that the Government had not completed the search of local law enforcement files until after repeated orders from this Court.

More importantly, the existence of the York County report raises the disturbing inference that similar evidence exists but has not been produced.  This inference is supported by the second example involving the existence of a witness statement that was not produced by the Government.  Throughout this case, Defendant has repeatedly demanded the production of certain documents and items relating to substantive charges and alleged overt acts.  During the February 8 and 9 hearings, Agent Bryant testified regarding the whereabouts of these specific items sought by the Defendant.  According to Agent Bryant, in some cases, the documents or tangible evidence have been lost, abandoned or destroyed; however, in most cases, the Government contends that the

---

[30]This duty goes back to Judge Payne's Order of September 6, 2001.  In ordering the required disclosures, Judge Payne "set out to make sure every opportunity that the defendants had to investigate whether there were alternative perpetrators would be open to them, and that meant getting hold of every single witness and talking to them."  10/30/01 Hearing Tr. at 10.

evidence must not exist, by virtue of the fact that it has not been found in the Government's files.[31]  Govt.'s Resp. Mot. Dismiss Disc. (II), at 9-12.

However, Defendant produced evidence demonstrating that the Government is simply mistaken in believing that certain items do not exist.  The Government produced a witness statement relating to the July 13, 1999, robbery of the Bank of Suffolk in Suffolk, Virginia, which indicated that two other individuals, a "David Bryant" and "Pamela Edwards" also gave statements to the FBI regarding their personal encounters with the perpetrators of that robbery.[32]  Def.'s Mot. Dismiss Disc. (II), at 14, Ex. 30.  The Government maintained that these statements were never taken and, therefore, it had no obligation to produce them.[33]  Govt.'s Resp. Mot.

---

[31]The Defendant also seeks the following evidence as necessary to prepare his defense: 1) a footwear impression related to the February 27, 1999, robbery of the Essex Savings Bank in Suffolk, Virginia, which the Government contends was smeared and determined to be of no value by the FBI; however, Agent Bryant could not recall whether the shoe impression had actually been taken; 2) videotapes and photographs for the December 30, 2000, robbery of the Metro City Bank in Richmond, which the Government contends does not exist because the battery ran out before the robbery occurred; 3) the statement of a witness to the September 4, 1999, robbery of the Citizens & Farmers Bank in Williamsburg, which the Government contends does not exist because it has not been located or retrieved; 3) documents relating to the authorities decision not to follow up on a lead indicating that a bank employee may have been involved with the October 16, 1999, robbery of the Peninsula Trust Bank of Mattaponi, based upon Employees' reports of suspicious behavior and motive, which the Government contends do not exist; 4) all the witness statements and FBI 302s related to the April 8, 2000, robbery of First Virginia Bank in Virginia Beach, and the June 10, 2000, robbery of the First Virginia Bank in Virginia Beach (different location), rather than the summaries that were provided, which the Government contends do not exist; 5) statements and items related to Anthony Harold, a confessed bank robber and witness, which the Government contends do not exist; 6) documents and statements relating the Butz Brothers, who were alleged to have been given firearms to "hold" after several robberies, which the Government contends do not exist; 7) videotapes and photos from the drive thru cameras for all of the robberies, which the Government contends do not exist; and 8) statements taken from Leon Ferby, "Kenny," Carrie Jones, and "Kita," who are individuals named in charging documents as witnesses or co-conspirators, which the Government contends do not exist.  Def.'s Mot. Dismiss Disc. (II), at 12-18; Exs. 28-35; Govt.'s Resp. Mot. Dismiss Disc. (II), at 9-12; 2/8/06 Hearing Tr. at 8-28, 39.

[32]This robbery is cited as an overt act in the Conspiracy Count.

[33]As to the whereabouts of Mr. Bryant's and Ms. Edwards's statements, Agent Bryant testified as follows:

> I contacted the detective in Suffolk, and he did not recall interviewing the two individuals.  He told me he would look into it and give me a call back if he did. I never heard back from the detective so I don't know – I don't believe those two people were ever interviewed by law enforcement.

Dismiss Disc. (II), at 9; 2/8/06 Hearing Tr. at 9-10.  However, evidentiary testimony at the

February 9 hearing revealed that David Bryant had given a detailed statement to the FBI about his

personal struggle with one of the robbers, that he was informed by the FBI that no one was

allowed to leave the scene until they were interviewed, and that the FBI took his boots for analysis

and comparison.[34]  2/9/06 Hearing Tr. at 24.  However, for no known reason, the Government was

not able to find or produce Mr. Bryant's statement and is simply mistaken in believing that his

statement was never taken.[35]

The existence of this statement raises an inference that similar materials do exist, although

they are not contained in the Government's file and despite the fact that the Government has not

found them.  These two findings regarding the York County report and the existence of Mr.

Bryant's statement lead the Court to FIND that the Government has continued to be negligent in its

handling of discovery in this case.

In so finding, the Court notes that assessing the Government's ability to comply with its

discovery obligations must be considered in light of the fact that six to eight years have passed

since the Government initially investigated these robberies.  Indeed, the Government is

experiencing the normal discovery problems associated with such a lengthy delay, which makes it

difficult to comply with discovery obligations, such as fading memories, loss of materials,

changing attorneys, and the like.  For example, Agent Bryant testified that shoe impressions

---

2/8/06 Hearing Tr. at 9-10.

[34]Also unaccounted for are the boots seized by the FBI at the scene.  According to Mr. Bryant, his boots
were never returned to him; these boots were not part of the Government's file, nor turned over to the Defendant
in this prosecution.

[35]Indeed, Agent Bryant testified that, due to the FBI's common investigatory practice, it would be
"unusual" for only one witness statement to a robbery with several victims to have been collected from all local
and federal agency files and would question where the other statements were.  2/8/06 Hearing Tr. at 42.

collected at the scene of the June 29, 2000, robbery of the James River Bank in Newport News

were destroyed by the Government because it had abandoned its case against Defendant and no

longer needed the evidence after the federal case against Anthony Harrell concluded.[36]  2/8/06

Hearing Tr. at 13.  According to Agent Bryant, other items may have been destroyed by the

Government, such as a videotape, but he could not confirm this with certainty.  Id. at 46.  In

addition, a videotape for the October 21, 2000, robbery has been lost, id. at 16, and witnesses have

relocated, which is also to be expected after a delay of six to eight years.  2/9/06 Hearing Tr. at 25.

At this time, the evidence before the Court indicates that prosecuting this case has proved

to be a virtually impossible task for the Government, as a cumulative result of discovery failures

originating in the Richmond prosecution, the length of time that has passed since the subject

robberies occurred, and the turnover in prosecutors.[37]  In so finding, the Court does not attribute

any specific fault to the prosecutor for the Government assigned to the instant prosecution.

Indeed, as the Court has previously noted, the prospect of having only one attorney and a single

case agent assigned to a case of this complexity, and with this history, constituted a heavy burden

on the prosecutor, particularly where he was the fourth prosecutor assigned to handle this case and

has literally had to start from the beginning to piece it together.  Nevertheless, the Government's

inability to abide by its constitutional and court-ordered discovery obligations constitutes

governmental negligence, which is a factor that weighs against the Government.  See Doggett,

505 U.S. at 657 ("Although [governmental] negligence is obviously to be weighed more lightly

---

[36]This robbery is cited as one of overt acts contained in the Conspiracy Count.

[37]At the hearing, the Government also acknowledged that the way the discovery was handled in the
Richmond prosecution was "unacceptable" and that "what occurred in Richmond, unfortunately, is baggage
which we bring to this case. . . ."  11/17/05 Hearing Tr. at 13.  "At the point that we indicted the case, . . . we
really had very little notice.  So when the case was indicted, all of the people who had been participating in the
case originally were no longer in the Richmond office.  And so our ability to re-create what had occurred was
hampered."  Id. at 14-15.

than a deliberate intent to harm the accused's defense, it still falls on the wrong side of the divide between acceptable and unacceptable reasons for delaying a criminal prosecution once it has begun."); see also Strunk, 412 U.S. at 436.  Thus, the Court FINDS that delay associated with the instant prosecution weighs against the Government.

Since the Court has found that each phase of prosecution was delayed due to governmental negligence, the Court concludes that the Government bears the primary responsibility for the overall delay experienced in this case.

**C. Assertion of the Right**

In Barker, the Supreme Court rejected a stringent rule that "a defendant who fails to demand a speedy trial forever waives his right," holding instead that "the better rule is that the defendant's assertion of or failure to assert his right to a speedy trial is one of the factors to be considered in an inquiry into the deprivation of the right."  Barker, 407 U.S. at 528.  This rule permits a court to "weigh the frequency and force of the objections as opposed to attaching significant weight to a purely pro forma objection."  Id. at 529.

In this case, Defendant makes no affirmative claim that he formally or informally asserted his right to a speedy trial prior to making this motion.  The Government argues that Defendant's claim that he has asserted his right to a speedy trial is inconsistent with requesting continuances in the Virginia Beach prosecution and contends that the Defendant has not properly asserted his right to a speedy trial.  Govt.'s Resp. Speedy Trial at 6.  This argument is not persuasive.  Although the Defendant relies primarily on the instant motion as evidence of asserting the right, the Court FINDS that it is sufficient evidence that Defendant has asserted his right to a speedy trial at this point in this case.  See Strunk, 412 U.S. at 436 (defendant's act of making Government informally aware of desire to have a speedy trial was an assertion of right even though he did not raise the

-36-

issue formally until his appeal).

Nevertheless, in weighing this factor under Barker, the Court must consider the frequency and force of Defendant's assertion and whether it was timely made.  Barker, 407 U.S. at 531-32 ("The third factor in the speedy-trial analysis calls on us to determine whether the defendant timely asserted his Sixth Amendment rights."); see also Wilson v. Mitchell, 250 F.3d 388, 396 (6th Cir. 2001).  In Grimmond, the Fourth Circuit found that, where the Defendant was continuously represented by counsel, his failure to assert the right until four months before trial weighed in favor of the Government.  137 F.3d at 829.  In this case, Defendant has been represented by four different attorneys.  Despite the obvious difficulties presented by that fact, it does not appear that Defendant lacked the benefit of counsel at any relevant stage of prosecution.  Thus, since Defendant first asserted his right to a speedy trial approximately one month before the trial, this factor is weighted in favor of the Government.  Id.  However, the fact that Defendant did not assert his right until after he made numerous unsuccessful efforts to secure constitutionally required and court-ordered discovery is a factor that causes the Court to weigh his late assertion less heavily against him than it otherwise would.  See Barker, 407 U.S. at 531 ("The strength of his efforts [to assert his right to a speedy trial] will be affected by the length of the delay, to some extent by the reason for the delay, . . . The more serious the deprivation, the more likely a defendant is to complain.").

**D. Prejudice**

Finally, the Court must evaluate the degree to which the Defendant has been prejudiced by a delay in excess of five years.  An unreasonable delay between formal accusation and trial, such as in this case, threatens to produce three sorts of harm, which must be considered in assessing the overall prejudice: 1) "oppressive" pretrial incarceration; 2) anxiety and concern of the accused;

and 3) the ability of the accused to prepare an adequate defense.  Doggett, 505 U.S. at 654 (citing

Barker, 407 U.S. at 532, Smith v. Hooey, 393 U.S. 374, 377-79 (1969), and United States v.

Ewell, 383 U.S. 116, 120 (1966)).  According to Barker, of these forms of prejudice, "the most

serious is the last, because the inability of a defendant adequately to prepare his case skews the

fairness of the entire system."  407 U.S. at 532.  As a general rule, the accused bears the burden of

demonstrating the specific ways in which the delay unfairly compromised his ability to defend

himself.  See United States v. Aguirre, 994 F.2d 1454, 1455 (9th Cir. 1993).

In this case, Defendant alleges two of the three forms of prejudice: actual prejudice arising

from a continuous and oppressive pretrial incarceration of five years and actual prejudice to his

ability to adequately prepare his defense resulting from the passage of time and the Government's

discovery shortcomings in this case.  Def.'s Mot. Speedy Trial at 11-12.

With respect to the first type of prejudice regarding a lengthy pretrial incarceration, there

can be no doubt that Defendant has suffered prejudice in having been incarcerated for five years

without the benefit of trial.  In addition to the obvious and substantial impairment of Defendant's

liberty, the Supreme Court in Smith v. Hooey observed that an excessive pretrial delay is also

"oppressive" because

> [c]onfined in a prison, . . . [the accused's] ability to confer with
> potential defense witnesses, or even to keep track of their whereabouts,
> is obviously impaired. And, while evidence and witnesses disappear,
> memories fade, and events lose their perspective, a man isolated in
> prison is powerless to exert his own investigative efforts to mitigate
> these erosive effects of the passage of time.

Hooey, 393 U.S. at 379-80 (internal quotations and citations omitted).  As noted above, this case

has experienced some of the normal problems associated with an extreme delay, such as lost

evidence and witnesses relocating.  Confined in prison, Defendant has been unable to engage in

any investigative activity to "mitigate these erosive effects."  Id.  Moreover, relying on counsel to

-38-

protect his rights while in custody is of significantly lessor value when Defendant has been represented by a different attorney in each phase of this prosecution.

With respect to the second type of harm, there is no direct evidence of actual prejudice arising from any particular anxiety of the Defendant.  However, such prejudice can be presumed from the extraordinary length of the delay, Defendant's difficulty in obtaining discovery to which he is entitled, and from having been represented by a total of four attorneys in this case.

The number of defense attorneys that have participated in this case also has direct implications regarding the third type of harm – the ability of the Defendant to adequately prepare a defense.  Defendant's attorney in the instant prosecution was presented with an extreme burden in handling a case that was previously handled by three different defense attorneys.  None of the attorneys worked together; each attorney picked up the case cold and literally had to start from the beginning to prepare a defense.  Thus, the Court finds that having been represented by four attorneys, through no fault of his own, is in itself strong evidence of actual prejudice to Defendant's ability to prepare an adequate defense.

On the other hand, Defendant has not yet produced objective proof that his defense has been prejudiced by unavailable witnesses or impaired by faded memories, or that the production of exculpatory evidence, even if produced unjustifiably late, has precluded him from making use of that evidence.  In other words, he has not established actual, particularized prejudice in his ability to prepare a defense.  However, a defendant's inability to make such a showing is not always fatal to establishing a speedy trial violation in cases involving an excessive delay.  Barker, 407 U.S. at 532; Hoskins v.  Wainwright, 48 F.2d 1186, 1192-93 (5th Cir. 1973).  In Moore v. Arizona, the Supreme Court observed that it is not necessary in every case for the accused to demonstrate actual prejudice in his ability to prepare a defense.  414 U.S. 25, 26 (1973); see also

<u>Doggett</u>, 505 U.S. at 655-56 ("[C]onsideration of prejudice is not limited to the specifically demonstrable, and . . . affirmative proof of particularized prejudice is not essential to every speedy trial claim.").

In <u>Doggett</u>, the Supreme Court found a speedy trial violation without a showing of actual or particularized prejudice "when the Government's negligence thus causes delay six times as long as that generally sufficient to trigger judicial review, and when the presumption of prejudice, albeit unspecified, is neither extenuated, as by the defendant's acquiescence, nor persuasively rebutted . . . ." 505 U.S. at 658 (internal quotations and citations omitted). <u>Doggett</u> did not definitively establish when a delay of less than six years will relieve a defendant of the need to make a particularized showing of prejudice.[38] However, <u>Doggett</u> does not relieve an accused from showing particularized prejudice in every case involving an excessive delay; rather, determining whether particularized prejudice is required depends upon the Court's analysis of the other <u>Barker</u> factors. <u>See</u> <u>Grimmond</u>, 137 F.3d at 830; <u>United States v. Brice</u>, 38 Fed. Appx. 898, 900 (4th Cir. 2002); <u>United States v. Cardona</u>, 302 F.3d 494, 499 (5th Cir. 2002).

Under <u>Doggett</u> and its progeny, the strength of the other factors, particularly the reason for the delay, "should be used to determine whether the defendant bears the burden to put forth specific evidence of prejudice (or whether it is presumed)."[39] <u>United States v. Bergfeld</u>, 280 F.3d

---

[38]<u>See, e.g.</u>, <u>Jackson</u>, 390 F.3d at1264 n.4 (holding that the lower court did not violate clearly established Supreme Court law where the lower court found that a four year and three month delay caused by governmental negligence warranted a presumption of prejudice); <u>Serna-Villarreal</u>, 352 F.3d at 231-33 (three-year delay caused by governmental negligence did not require dismissal of the indictment absent evidence that delay undermined the fairness of a trial).

[39]<u>See, e.g.</u>, <u>Grimmond</u>, 137 F.3d at 830 (finding no speedy trial violation where the thirty-five month delay was supported by a legitimate reason favoring the Government and the defendant could show no actual prejudice); <u>United States v. Bergfeld</u>, 280 F.3d 486, 489-91 (5th Cir. 2002) (five year and three month delay was presumptively prejudicial where reason for the delay was governmental negligence); <u>Cardona,</u> 302 F.3d at 499 (five year and six month delay was presumptively prejudicial where Government was negligent); <u>United States v. Brown</u>, 169 F.3d 344, 350 (6th Cir. 1999) (same); <u>United States v. Shell</u>, 974 F.2d 1035, 1036 (9th Cir. 1992) (six-year delay was presumptively prejudicial where government was negligent).

486, 490 (5th Cir. 2002); see also Doggett, 505 U.S. at 657; Cardona, 302 F.3d at 498; Brice, 38 Fed. Appx. at 900.  For example, if the reason for the delay is valid, such as when the Government diligently pursues a defendant from indictment to arrest, a speedy trial claim will always fail without a showing of actual prejudice.  Doggett, 505 U.S. at 656.  In contrast, a lengthy bad faith delay by the Government may "present an overwhelming case for dismissal" even without a showing of actual prejudice.  Id. at 657.

Governmental negligence occupies the middle ground between a valid and a bad faith delay.  Doggett, 505 U.S. at 656-57.  The Doggett Court explained that while a bad faith delay may render a violation "virtually automatic," governmental negligence is not "automatically tolerable simply because the accused cannot demonstrate exactly how it has prejudiced him."  Id. The Court's tolerance is prescribed primarily by the length of the delay.  "[S]uch is the nature of the prejudice presumed that the weight we assign to official negligence compounds over time as the presumption of evidentiary prejudice grows.  Thus, our toleration of such negligence varies inversely with its protractedness. . . ."  Id. at 657.  The difficulty of showing prejudice generally increases with the length of the delay; therefore, the one who is truly prejudiced by the delay may find the burden of proof most difficult to meet.  Id.  Thus, when the Court determines that the reason for the delay is attributed to governmental negligence, the length of the delay is of primary relevance in assessing the degree to which the Defendant's defense has been unfairly prejudiced.

Defendant argues that the length of the delay and the Government's role in causing delay entitles Defendant to a presumption of prejudice.  Def.'s Mot. Speedy Trial at 11-12.  In this case, Defendant has experienced a delay in excess of five years and the reason for the delay is a result of governmental negligence, arising from the Government's failure to appreciate and abide by its court-ordered and constitutional discovery obligations and from abandoning this case in 2001 and

allowing almost four years to go by before filing the instant Indictment.  Consequently, the Court

is now faced with the prospect of going to trial on evidence that is between six and eight years

old.  Although Defendant has not demonstrated the specific way in which his defense is adversely

impacted, such as by impaired memories or unavailable witnesses, there is certainly evidence in

this case that the delay has impacted evidence in a way characteristically associated with a lengthy

delay, such as discovery problems, lost evidence, and relocated witnesses.  The fact that

Defendant has not demonstrated particularized prejudice from this evidence does not preclude him

from establishing a violation of his right to a speedy trial.  According to Doggett, the exception to

requiring particularized prejudice is based upon the reality that "impairment of one's defense is

the most difficult form of speedy trial prejudice to prove because time's erosion of exculpatory

evidence and testimony 'can rarely be shown.'"  Id. (quoting Barker, 407 U.S. at 532).

Because there is no evidence the Defendant acquiesced in the delay or that his efforts to

obtain the discovery to which he is entitled were purposed to extenuate the delay, the Court FINDS

that Defendant is entitled to a presumption of prejudice.  See Doggett, 505 U.S. at 657 (reasoning

that the longer the delay, the greater the likelihood of evidentiary prejudice which threatens the

fairness of a trial); Hoskins, 485 F.2d at 1193 ("The speedy-trial safeguard is premised upon the

reality that fundamental unfairness is likely in overlong prosecutions. . . ."); Serna-Villarreal, 352

F.3d at 233 (reasoning that a presumption of prejudice is warranted where the "government's

negligence or the resulting length of the delay [] adversely affected the evidence so as to

undermine the fairness of a trial.").

The issues arising from the Government's role in causing the delay present a more

compelling justification for presuming prejudice than was present Doggett.  The evidence

produced at the February 8 and 9 hearing clearly demonstrates that Defendant's ability to prepare

an adequate defense has been substantially threatened by the Government's inability to comply

with discovery.  In considering alternatives short of dismissal, this Court and, previously, Judge

Payne have ordered the most comprehensive discovery production conceivable in order remediate

the Government's failure to timely produce exculpatory evidence and ensure a fair trial.  Just as

Judge Payne believed in 2001, this Court believed that this comprehensive remedy, coupled with

continuing the trial, would cure the prejudice arising from the Government's continuing discovery

failures.

    However, for the fourth time in this case, previously unproduced exculpatory evidence has

been discovered within weeks of trial and the Government cannot demonstrate to the Court that it

has, or will be able to, produce all discovery to which the Defendant is entitled.  More

importantly, the Court FINDS that there is a substantial danger of prejudice arising from the threat

that the extraordinary delay has tainted or rendered effectively useless the late production of

exculpatory evidence, as well as from the inference that other exculpatory evidence may be in

existence that will never be discovered and turned over to the Defendant.[40]

---

[40]Defendant argues that, like the exculpatory evidence in produced in the Richmond prosecution, the York County report prejudices all charged offenses because it relates to modus operandi evidence.  Def.'s Mot. Dismiss Disc. (II), at 7.  The Government rebuts Defendant's assertion, arguing that "[a]t no time during the current prosecution has the United States said or done anything to suggest that modus operandi would serve as our method of proof."  Gov't.'s Resp. Mot. Dismiss Disc. (II), at 4.  However, at Defendant's grand jury hearing, Agent Bryant testified that Defendant "came to [the Government's] attention as a result of an investigation through a series of robberies that were linked by modus operandi or very similar in nature . . . ."  Transcript of the Grand Jury proceeding, held on July 11, 2005, at 2-3.  Agent Bryant was then asked to explain in more detail what the consistent actions in the robberies were, and Agent Bryant then went on to describe the specifics of the modus operandi evidence.  Id.  Thus, it appears that modus operandi was a substantial method of proof for obtaining the instant indictment.

    Defendant also argues that the prejudice arising from the late-production of evidence cannot be cured because Defendant "is not charged with committing the relevant bank robberies as separate, underlying charges.  As such, the most the Court could do is prohibit the Government from alleging the bank robberies as part of the overall conspiracy."  Def.'s Mot. Dismiss Disc. (II), at 7 n.2.  He further argues that

         because the exculpatory evidence, by its very nature helps the defense, it is likely
         in the defense's best interest to present such information before the jury.
         Prohibiting the Government from introducing evidence of such robberies puts
         the defense in the curious position of introducing uncharged bad conduct in order

There is no further order that the Court can issue to ensure that the Defendant is provided a fair trial. The inability of the Court to craft a remedy which will guarantee that the Defendant is provided all discovery to which he is entitled is strong evidence of prejudice to Defendant's ability to prepare an adequate defense. As previously noted, the impact of having been represented by four separate defense attorney's is also strong evidence of prejudice. Additionally, unlike the defendant in <u>Doggett</u>, the Defendant has been incarcerated throughout this case, a fact which raises additional concerns regarding Defendant's presumed inability to prepare an adequate defense. <u>See</u> <u>Hooey</u>, 393 U.S. at 379-80. Thus, the presumption that Defendant's ability to prepare an adequate defense has been prejudiced is more pronounced in this case than in <u>Doggett</u>.

**E. All Relevant Factors**

As evidenced by the foregoing discussion, the issues invoked by the Defendant's Renewed Motion to Dismiss for Discovery Failures and Motion to Dismiss for a Speedy Trial Violation are inextricably intertwined. Whether viewed in light of the Government's discovery failures or Defendant's right to a speedy trial, dismissing an indictment is an extreme and ultimate remedy. To the extent that a lessor remedy will cure prejudice arising from the Government's discovery failures and ensure the Defendant a fair trial in a timely manner, a lessor remedy is to be preferred.

In these series of prosecutions against the Defendant, many lessor remedies have been attempted. In the Richmond prosecution, Judge Payne continued Defendant's trial twice – both times as a result of the Government's discovery misconduct. There, Judge Payne considered dismissing this case with prejudice due to the Government's fundamental failure to produce exculpatory evidence. However, Judge Payne granted the lessor remedy of dismissing the

---

to prove that others may have committed the uncharged robberies. The chances of the defense confusing the jury or prejudicing himself are obvious.
<u>Id.</u> This Court agrees that the late-production of this and other exculpatory evidence presents a substantial threat of prejudice at trial.

indictment without prejudice upon the Government's request and over the objection of the Defendant.  In the Virginia Beach prosecution, numerous continuances were granted, most of which appear to be related to the federal discovery, as does the prosecutor's ultimate decision to dismiss the case.  In the instant prosecution, this Court has also been compelled to continue Defendant's trial twice – each time related to the Government's lack of compliance with its discovery obligations.

The Court does not find that the Government intentionally delayed the instant prosecution or neglected its discovery obligations in bad faith; rather, these problems appear to have originated with negligence during the initial investigation and the Richmond prosecution of this matter – between 1998 and 2001 – and continued through the present.  The Court finds that the Government is simply not able to purge the instant prosecution from the discovery problems originating in the Richmond prosecution.  First, it is significant that between the dismissal of the Richmond prosecution in November 2001 and November 2005, the Government undertook no additional investigation whatsoever, whether federal or state, nor did the Government take any steps to resolve the problems with the discovery.  Further, after having originally indicted in Richmond, the Government chose to re-indict Defendant in a different division, before different judges, and with a different prosecutor and case agent.

These circumstances placed an extreme burden upon the Government in prosecuting a case that was already strained by substantial discovery problems.  The Government's difficulty in this regard is further burdened by the fact that between six to eight years has passed since the subject robberies occurred.  The Government's latest Exculpatory and Evidence Production raises an inference that there is other evidence, some of which may be exculpatory, which may never be discovered or produced.  Pursuant to the Court's Discovery Order and Judge Payne's Order, the

Government was already obligated to comply with a comprehensive discovery production to cure the substantial threat of prejudice arising from the Government's past and continuing discovery failures.  Thus, no further discovery order may reasonably be expected to eliminate the threat of prejudice arising from the impact of further delay.

The Defendant has been held in either federal or state custody for five years on charges that should have gone to trial in 2001, but for the Government's discovery problems in the Richmond prosecution.  Thus, three of four <u>Barker</u> factors weigh decisively in the favor of Defendant, and when considered together with all relevant factors in this case, the Court FINDS that Defendant's Sixth Amendment right to a speedy trial has been violated and the instant Indictment must be dismissed with prejudice.

## IV. CONCLUSION

For the reasons stated herein, Defendant's Motion to Dismiss for a Speedy Trial Violation is **GRANTED** and Defendant's Motion to Dismiss for Discovery Failures is subsumed in the Speedy Trial violation.  Accordingly, the Court **ORDERS** that the instant Indictment be dismissed, with prejudice.

The Clerk is **REQUESTED** to mail a copy of this Order to all counsel of record.

It is so **ORDERED**.


_____
                        /s/
*HONORABLE HENRY COKE MORGAN, JR.*
SENIOR UNITED STATES DISTRICT JUDGE


Norfolk, Virginia
April 5, 2006